2021 IL App (1st) 192464-U

No. 1-19-2464

Order filed September 21, 2021.

Second Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 14 CR 6852 |
| | ) | |
| MARTIN GUTIERREZ, | ) | The Honorable |
| | ) | Ursula Walowski, |
| Defendant-Appellant. | ) | Judge Presiding. |

_____

JUSTICE LAVIN delivered the judgment of the court.
Presiding Justice Fitzgerald Smith and Justice Howse concurred in the judgment.

ORDER

¶ 1    *Held*: Defendant's convictions for predatory criminal sexual assault of a child are affirmed where the evidence presented at trial was sufficient to support the jury's guilty verdict and where no error based on prosecutorial misconduct occurred to warrant a new trial.

¶ 2    Following a jury trial, defendant Martin Gutierrez was found guilty of predatory criminal sexual assault of a child (720 ILCS 5/12-14.1(a)(1) (West 2014)) and sentenced to a total of 75 years in prison for conduct toward his then five-year-old daughter, M.G. (the victim).

¶ 3    On direct appeal, defendant contends that his convictions must be reversed because the jury's guilty verdict was not supported by the evidence. Defendant alternatively contends that a new trial is warranted, setting forth a number of forfeited claims based on prosecutorial misconduct, which he argues may be reviewed under the plain error doctrine. Finally, defendant contends that his trial counsel was ineffective for not objecting at trial to the alleged prosecutorial misconduct. Finding no merit in defendant's arguments, we affirm.

¶ 4                                    BACKGROUND

¶ 5    In the spring 2014, defendant was arrested and then charged with multiple counts of the above-stated sex offense after M.G. reported that he sexually assaulted her on a regular basis between September 2002 and December 2004.

¶ 6    Two of the arresting officers spoke Spanish to defendant, including Detective Casanova who translated for him. At the police station, defendant agreed to give a written statement to the assistant State's attorney (ASA) in which he confessed to sexually assaulting his daughter.

¶ 7    Defendant's written statement contained *Miranda* warnings, which were also given to him in Spanish, and read, in pertinent part, that defendant "touched his daughter, [M.G.], approximately 300 times *** when she was between the ages of six and nine years old." This included, among other things, putting "his fingers inside [M.G.]'s vagina" and "his penis inside" her vagina, anus and mouth. Defendant stated that "he ejaculated when he touched his daughter on her vagina and buttocks 20 times" and that "if [she] didn't ask him to stop, he would have continued touching her." Defendant further stated that he was not handcuffed or under the influence of drugs or alcohol at the time of his statement.[1]

---

[1]Defendant later claimed that he drank "approximately 24 beers" prior to making his statement when he moved, unsuccessfully, to suppress it on that basis.

¶ 8    Although defendant gave his statement to the ASA with Detective Casanova translating, he still moved to suppress it as involuntary because he couldn't understand English. Defendant, however, conceded at the suppression hearing that Detective Casanova and her partner spoke to him in Spanish at the police station and that he understood them. Consequently, the trial court denied defendant's suppression motion, finding that the English-Spanish language barrier did not affect the voluntariness of his statement.

¶ 9    While he was represented by private counsel, defendant filed several *pro se* motions to suppress evidence and dismiss the charges against him, all of which were stricken. After the trial court informed defendant that he couldn't file his own motions, defendant falsely claimed that his attorney was not registered, leading that attorney to withdraw from the case. Defendant, thereafter, filed *pro se* motions for substitution of judge and change of venue that were ultimately denied. Suffice it to say, a public defender was eventually appointed to represent defendant at trial and at sentencing. We note, however, that after one was appointed, defendant filed a *pro se* interlocutory appeal that was dismissed for lack of this court's jurisdiction. See *People v. Gutierrez*, No. 1-17-2575 (2018) (disposition order granting the State's motion to dismiss the defendant's interlocutory appeal on jurisdictional grounds).

¶ 10    At trial, defendant's written statement was read to the jury. In addition, trial evidence showed that over a four-year period, defendant repeatedly preyed on M.G. when no other adult was present, entering her bedroom at night where he orally, anally and vaginally raped her. M.G. testified that defendant began sexually assaulting her after her fifth birthday. At the time, they lived in an apartment with M.G.'s mother, Zulma Gutierrez, and her younger brother, C.G. Zulma slept in a bedroom toward the back of the apartment, but defendant often slept in the living room, which was adjacent to M.G. and C.G.'s bedroom.

¶ 11    The first time that defendant sexually assaulted M.G. she was lying in her bed when he entered the room. Although C.G. had his own bed, he was sleeping in M.G.'s bed that night near her feet. Defendant laid behind M.G., then touched her vagina, digitally penetrating her. M.G. testified that she "felt *** pressure" and "a burn" when he moved his fingers inside her. The next two days, defendant again entered M.G.'s bedroom where he vaginally and anally penetrated her. M.G. testified about the assault, stating: "[i]t hurt, it stung, I [*sic*] felt pressure, I couldn't breathe." When asked why she didn't scream, M.G. stated that she "was frozen." Defendant ejaculated on M.G. both days but cleaned her off before leaving the room.

¶ 12    Thereafter, defendant sexually assaulted M.G. "two, three times a week" for years. Among other things, defendant placed M.G.'s hands on his penis, performed oral sex on her and forced his penis into her mouth, vagina and anus. M.G.'s mother, Zulma, testified that she was unaware of M.G. being abused. During that time, however, Zulma was often either working or attending night classes, so she relied on defendant to take care of M.G. and her brother. And while Zulma worked as an advocate for foster children who had been sexually abused, she wasn't a licensed social worker that made assessments regarding their abuse.

¶ 13    Defendant stopped assaulting M.G. when she was nine years old after she told him that "all [she] wanted for Christmas was for him to stop." A few years later, however, M.G. began suffering from anxiety. Defendant, meanwhile, became very strict with her. M.G. testified that defendant "never let [her] wear *** shorts or tank tops" and that if she did, "[h]e would hit [her]."

¶ 14    When she was in high school, M.G. told a friend about the abuse. Subsequently, the police and a caseworker from the Department of Child and Family Services (DCFS) showed up at defendant's home. M.G. initially denied the assault allegations against defendant because she

was afraid of upsetting her mother. According to M.G., defendant then apologized to her for the assault. He begged her to not say anything because "they'd take him away" and then her mother and brother "would never see him again."

¶ 15     The next day at the hospital, however, M.G. admitted to her mother, grandmother and brother that the allegations were true. M.G. testified that she finally told them because they "were far away from [defendant]" who was at home. The police arrested defendant outside his home the next evening.

¶ 16     A transcript of a jail call between defendant and M.G.'s grandmother, Carmen Ochoa, who also testified at trial, was read to the jury. The transcript contained the following relevant exchange between them:

> "[Carmen]: What is going on, Martin?
>
> [Defendant]: Forgive me, Dona Carmen.
>
> [Carmen]: [M.G.] is who would forgive you. What you did doesn't have a name. It doesn't have a name. We gave you our trust. We saw you as a son.
>
> [Defendant]: (Inaudible.) I know. I know.
>
> [Carmen]: It's too late now, Martin, because you did it and you are going to pay for it. You killed [M.G.] in real life. How is it possible that you would have the courage to do that? How? Zulma in the hospital. [M.G.] in the hospital with panic attacks. [C.G.] the same. I don't know what – or to ask for forgiveness or I don't know what, but you know that –
>
> [Defendant]: I'm doing it already, Dona Carmen. I'm doing it already.
>
> [Carmen]: Yes. But you know that you have to pay for it.
>
> [Defendant]: I know it."

The jury ultimately found defendant guilty on all five counts of predatory criminal sexual assault.

¶ 17    The trial court denied defendant's motion for a new trial, then sentenced him to 15 years in prison for each of the five counts, to be served consecutively. The court subsequently denied defendant's oral motion to reconsider his sentence, and he appealed.

¶ 18                                   ANALYSIS

¶ 19    Defendant first contends that his convictions for predatory criminal sexual assault should be reversed because there was insufficient evidence to support the jury's guilty verdict. Specifically, he asserts that the trial evidence was either unreliable or ambiguous, and that there was no physical or eyewitness evidence of sexual assault presented to the jury.

¶ 20    When a defendant challenges on appeal the sufficiency of the evidence, we must determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the offense proven beyond a reasonable doubt. *People v. Brown*, 2013 IL 114196, ¶ 48 (citing *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979)). As the reviewing court, we do not retry the defendant or substitute our judgment for that of the trier of fact on questions involving the weight of the evidence, the credibility of the witnesses or the resolution of conflicting testimony. *People v. Garcia*, 2012 IL App (1st) 103590, ¶ 82. Furthermore, a defendant's convictions will not be reversed unless the evidence is so unreasonable, improbable or unsatisfactory that it creates a reasonable doubt of his guilt. *Id*.

¶ 21    To sustain a conviction for predatory criminal sexual assault of a child, the State had to prove beyond a reasonable doubt that defendant, who was 17 years of age or older, committed an act of sexual contact or penetration upon the victim, who was younger than 13 years old. 720

ILCS 5/12-14.1(a)(1) (West 2014). "Sexual penetration" means, as relevant here, any contact or intrusion, however slight, of any body part of one person into the sex organ, mouth or anus of another person. 720 ILCS 5/11-0.1 (West 2014). Additionally, "[e]vidence of emission of semen is not required to prove sexual penetration." *Id.*

¶ 22    Viewing the evidence in the light most favorable to the State, we conclude that the jury in this case could have reasonably found defendant guilty of predatory criminal sexual assault beyond a reasonable doubt. We first address defendant's contention that no weight should have been afforded to his statement because it was written in English, a language he does not understand. Although defendant's argument is not entirely clear, he seems to suggest that the mere possibility of an inaccurate translation by Detective Casanova rendered his statement to the ASA inherently unreliable. This argument is clearly untenable.

¶ 23    As previously stated, defendant admitted at the suppression hearing that Detective Casanova translated for him when he gave his statement to the ASA and that he understood her Spanish. See *supra* ¶ 8. While defendant now argues that we cannot determine the accuracy of Detective Casanova's translation since it wasn't recorded, he concedes in his appellate brief that she read the written statement to him in Spanish at the police station.[2] Thus, we cannot say it was unreliable for that reason.

¶ 24    Defendant, however, contends that there was insufficient evidence, independent of his statement, to prove him guilty of the offense beyond a reasonable doubt. We disagree.

¶ 25    It is well-settled that a victim's testimony alone is sufficient to sustain a criminal sexual assault conviction. *In the Interest of C.K.M.*, 135 Ill. App. 3d 145, 150 (1985); see also *People v.*

---

[2]At the time defendant gave his statement, it was not subject to the electronic recording requirement. See 725 ILCS 5/103-2.1(b-5)(1) (eff. Jan. 1, 2017) (requiring electronic recordings of custodial interrogations conducted in predatory criminal sexual assault cases on or after June 1, 2014, in order for them to be admissible).

*Le*, 346 Ill.App.3d 41, 50 (2004) (in affirming the defendant's criminal sexual assault conviction, the court noted that a victim's testimony need not be corroborated by physical or medical evidence to sustain such a conviction); *People v. Cookson*, 215 Ill. 2d 194, 215 (2005) (in affirming the defendant's predatory criminal sexual assault conviction, the court stated, "[h]ere, as in many if not most child sexual abuse cases, there was no testimony from third-party eyewitnesses" and "no physical evidence linking [him] to the alleged abuse"); *Garcia*, 2012 IL App (1st) 103590, ¶ 89 (in affirming the defendant's predatory criminal sexual assault convictions, the court noted that the statutory definition of penetration does not require physical evidence).

¶ 26     With that in mind, we reject defendant's claim that the lack of physical or eyewitness evidence in this case categorically created a reasonable doubt of his guilt. Defendant has not developed any arguments supporting his claim nor has he cited any authority providing that sexual assault convictions cannot be sustained absent such evidence. Instead, he has speculated that given M.G.'s size and the number of times she was purportedly assaulted, it is "inconceivable" that she was not physically injured by it and "equally unbelievable that no one ever saw any of the alleged contact," including her mother who worked with sexually abused children. This information, however, was presented to the jury whose function it was to weigh that evidence. Thus, defendant is essentially asking us to substitute our judgment for the jury's by reweighing the same evidence, and we decline to do so.

¶ 27     As set forth above, the jury in this case was presented with M.G.'s detailed testimony that defendant, then age 31, penetrated her vagina digitally, performed oral sex on her, and orally, vaginally and anally raped her over a four-year period starting when she was five years old. According to M.G., the assault occurred in her bedroom while her mother was either at work or

asleep. M.G. didn't tell her mother about the assault because she was afraid of upsetting her but planned on telling her when she turned eighteen. M.G. further testified that defendant told her "not to say anything" about the assault when the police and DCFS showed up but that she told her mother and grandmother about it at the hospital the next day, a statement that was corroborated by their own testimony. This evidence certainly supports the jury's findings of guilt.

¶ 28    Defendant, nonetheless, asserts that M.G.'s testimony was somehow unreliable based on minor discrepancies between what she said at trial and what she first told the police and DCFS, including that the allegations against him were false. A complainant's testimony, however, need not be unimpeached or uncontradicted to sustain a conviction for sexual assault. *Garcia*, 2012 IL App (1st) 103590, ¶ 84. Where, as here, minor inconsistencies exist in a complainant's testimony but do not detract from the reasonableness of her story as a whole, the testimony may be found adequate to support a conviction for sexual assault. *Id.*

¶ 29    In this case, the jury was presented with M.G.'s supposedly conflicting testimony but ultimately found her to be a credible witness. Because defendant has not shown, or even argued, that her testimony was inadequate, his convictions cannot be overturned on that basis. For the same reasons, we cannot overturn defendant's convictions simply because he believes that no weight should have been afforded to the jail call between him and Carmen. Although defendant asserts that the jail call was ambiguous, this does not establish that the evidence was unreasonable, improbable or unsatisfactory such that it created a reasonable doubt of his guilt. Accordingly, we conclude that the evidence in this case was sufficient to sustain defendant's predatory criminal sexual assault convictions.

¶ 30    We next turn to defendant's alternative contention that a new trial is warranted due to prosecutorial misconduct in the State's opening and closing arguments, which deprived him of a fair trial. As stated, defendant concedes that he did not preserve these claims by either objecting at trial or raising the issues in a posttrial motion, thereby forfeiting them on appeal. See *People v. Jackson*, 2012 IL App (1st) 092833, ¶ 33 ("In order to preserve an issue for review on appeal, the defendant must object to the error at trial and include the objection in a posttrial motion."). Defendant, however, argues that we should review these claims for plain error.

¶ 31    Under the plain error doctrine, forfeited claims are reviewable if either (1) a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, or (2) a clear or obvious error occurred that was so fundamental that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of evidence. *Id*. ¶ 34. In both instances, the burden of persuasion showing the error was prejudicial remains with the defendant. *People v. Herron*, 215 Ill. 2d 167, 187 (2005). But first, we must determine whether a clear and obvious error occurred.

¶ 32    Although the State has wide latitude in both its opening and closing arguments and may discuss matters relevant to the question of guilt or innocence, it cannot make comments that serve no purpose other than to inflame the jury's prejudices and passions. *People v. Cross*, 2019 IL App (1st) 162108, ¶ 73. Courts have criticized the use of derogatory epithets to describe a defendant, even if they are arguably based on the evidence. *Id*. Nevertheless, such remarks do not warrant a new trial unless the remarks were so prejudicial that there is no way to tell whether the guilty verdict resulted from them. *Id*. ¶ 74.

¶ 33    Defendant here asserts that it was improper for the State to characterize him as a "predator" and a "rapist" during its opening and closing arguments. These characterizations, however, were reasonable inferences drawn from specific acts that defendant allegedly committed. *Cf. People v. Jones*, 2016 IL App (1st) 141008, ¶ 24 (finding that the State's characterization of the defendant as a "cold blooded criminal" facing off against police officers had no basis in fact when he had previously never been convicted of a crime). Additionally, the State may comment unfavorably about the evil character of a crime so long as it is based on the evidence. *Jackson*, 2012 IL App (1st) 092833, ¶ 45. Because the State's characterizations of defendant were based on the evidence that was presented to the jury in this case, we find that no error occurred, let alone plain error.

¶ 34    Defendant also asserts, however, that the State made inappropriate comments about his race during its rebuttal in closing argument. We disagree.

¶ 35    In his closing argument, defense counsel asserted that defendant's confession should have been afforded little to no weight because it wasn't written in Spanish. In making this argument, defense counsel compared defendant's situation at the police station (with the English-Spanish language barrier) to an individual who only speaks English being interrogated by Russian police officers in the Soviet Union. The State responded on rebuttal, stating: "No, ladies and gentlemen, we're in America, that is not the way it works. So because I speak Spanish, I should request everything in Spanish. No, we're in America."

¶ 36    While the State's comments might have been better left unsaid, they were arguably invited by defense counsel's closing remarks. Regardless, the State's comments did not constitute an improper racial epithet as they clearly referred to the fact that defendant spoke Spanish, not to his race. We thus find that no error occurred.

¶ 37    Based on the foregoing, defendant cannot establish that he was prejudiced by the State's opening and closing remarks, which is necessary to sustain his ineffective assistance claim. See *Strickland v. Washington*, 466 U.S. 668 (1984) (an ineffective assistance claim requires the defendant to show that counsel's conduct fell below an objective standard of reasonableness and that he was prejudiced as a result of that conduct). Because we found that no error occurred with respect to the State's opening and closing remarks, defendant cannot show that trial counsel's failure to object to them was unreasonable or that he was prejudiced as a result of that decision.

¶ 38    For the reasons set forth above, we affirm defendant's convictions for predatory criminal sexual assault of a child and his sentences for them.

¶ 39    Affirmed.